IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| NAGENDRA SINGH,<br><br>    Plaintiff,<br><br>vs.<br><br>DISH NETWORK LLC, ECHOSHPERE LLC, and SLING T.V. LLC,<br><br>    Defendants. | MEMORANDUM DECISION AND ORDER<br><br><br>Case No. 2:18-cv-00856-DAK<br><br>Judge Dale A. Kimball |

    This matter is before the court on Defendants' Motion to Dismiss and Compel Arbitration. The court held a hearing on the Motion on June 26, 2019. At the hearing, Plaintiff was represented by Russell T. Monahan, and Defendants were represented by Eric G. Goodrich and Jarom R. Jones. The court took the matter under advisement. The court considered carefully the memoranda and other materials submitted by the parties, as well as the law and the facts relating to the Motion. Now being fully advised, the court issues the following Memorandum Decision and Order.

## BACKGROUND

    In 2016, Sling T.V. LLC[1] (Echosphere LLC)[2] hired Plaintiff Nagendra Singh ("Singh"). In March 2017, Echosphere entered into a merging transaction with Defendant DISH Network LLC (collectively, with Sling T.V. LLC and Echosphere LLC, "DISH"). As a result of the merger, certain employees of Echosphere, including Singh, became employed by DISH and were

---

[1] The business relationship between Sling T.V. LLC and Echosphere LLC has never been made apparent to the court. This relationship is immaterial for the purposes of this Motion.
[2] "Echosphere" is listed as a defendant in this case. Singh refers to the company that merged with DISH in his Complaint as "Echosphere." However, in DISH's Motion to Dismiss and Compel Arbitration, DISH asserts that it entered into a merging transaction with "EchoStar," rather than "Echosphere." This discrepancy has never been addressed by either party. Moreover, the distinction is immaterial for purposes of this Motion.

required to sign new "onboarding" documents. According to DISH, the onboarding documents were composed of six documents: (1) Mutual Arbitration of Disputes – Waiver of Rights Agreement ("Arbitration Agreement"); (2) Agreement Regarding Confidential Information, Proprietary Development and Conflict of Interest ("Confidentiality Agreement"); (3) Drug and Alcohol Policy; (4) Release of Claims; (5) Acknowledgments; and (6) Veteran's Self ID Form.

The onboarding documents were reviewed and signed by the new employees through an online portal and tracking system called iCims. This system utilized a feed from Oracle, DISH's human capital management system, to create employee profiles, which resulted in the creation of an employee profile for Singh. On May 17, 2017, after employees' iCims profiles had been created, a member of DISH's H.R. Compliance Team sent an email invitation to certain employees, including Singh, containing a link to complete onboarding paperwork and a link to reset their password if necessary. Once logged in, employees could review each of DISH's onboarding documents. DISH employees would indicate their assent to the onboarding documents by selecting the radio button next to "Yes" at the bottom of each document and then clicking submit at the end of the form. All documents pre-populated the employee's name and date. The Arbitration Agreement presented by DISH did not have the "I Accept" notation that the other onboarding documents contained. Rather, it contained an "Employee Signature" with a signature and a time stamp.

iCims creates an audit trail for each completed onboarding document. According to DISH's H.R. Compliance Manager, AK Miller, the audit trails reveal that Singh executed the onboarding documents on May 18, 2017 at the following times: (1) Arbitration Agreement – 9:09 am; (2) Confidentiality Agreement – 9:11 am; (3) Drug and Alcohol Policy – 9:12 am; (4) Release of Claims – 9:12 am; (5) Acknowledgments – 9:13 am; and (6) Veteran's Self ID Form

2

– 9:13 am. Importantly, the Arbitration Agreement that Singh signed and agreed to provides, in relevant part:

> In consideration of the mutual promises contained within this Agreement, Employee and DISH mutually agree that any past, present, or future claim, controversy and/or dispute between them, *including without limitation any claim or dispute arising out of or related to Employee's application for employment, employment, and/or termination of employment* shall be resolved by binding arbitration administered by the American Arbitration Association. ¶ 1.

Arbitration Agreement at ¶ 1 (emphasis added).

Singh filed the instant action in this court, alleging DISH maintained unlawful employment practices under Title VII. Specifically, Singh's Complaint alleges causes of action for hostile work environment, discrimination, and retaliation. DISH now moves to dismiss the Complaint and compel arbitration as required by the Arbitration Agreement. DISH asserts that Singh, as part of his employment with DISH, signed the Arbitration Agreement thereby agreeing to submit all claims – including claims arising out of or relating to his application for employment, employment, or termination of employment – to binding arbitration.

## DISCUSSION

The Federal Arbitration Act ("FAA") provides that "an agreement in writing to submit to arbitration an existing controversy arising out of … a contract [or] transaction … shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Consequently, when deciding a motion to dismiss and compel arbitration, a court must first determine whether a valid arbitration agreement exists. *BOSC, Inc. v. Bd. of City Comm'rs of City of Bernalillo*, 853 F.3d 1165, 1177 (10th Cir. 2017) (noting that the moving party "bears the initial burden of presenting evidence sufficient to demonstrate the existence of an enforceable agreement"). Once a valid arbitration agreement has been established, a court must then determine whether there is a "genuine dispute of material fact

regarding the existence of an agreement." *Id.* (noting that the "burden shifts to the nonmoving party to raise a genuine dispute of material fact"). If a court is "satisfied" that there is no genuine dispute of material fact, and that the making of the arbitration agreement is "not in issue," the FAA instructs courts to direct "the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4; *see BOSC, Inc.*, 853 F.3d at 1177 ("When a quick look at the case reveals that no material disputes of fact exist, a district court may decide the arbitration question as a matter of law."). If, however, the court feels that the making of the arbitration agreement "be in issue, the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4; *see BOSC, Inc.*, 853 F.3d at 1177 ("[I]f material disputes of fact do exist, the FAA calls for summary trial – not death by discovery.").

**A. The Existence of a Valid Arbitration Agreement**

In this case, Singh disputes that the Arbitration Agreement was included among DISH's onboarding documents and denies reviewing or accepting the Arbitration Agreement. Arguing that this constitutes a genuine dispute of material fact, Singh urges the court to deny DISH's Motion to Dismiss and Compel Arbitration. However, Dish points out that Singh actually testified in his declaration and while under oath that he has no *recollection* of either signing or reviewing the Arbitration Agreement, and courts have repeatedly held that "a party's inability to remember signing contracts" is insufficient "to raise a material issue as to the validity of the agreements." *See Ernest v. Lockheed Martin Corp.*, No. 07-CV-02038-WYD-KLM, 2008 WL 2958964, at *5-6 (D. Colo. July 29, 2008); s*ee also Mitchell v. Craftworks Restaurants & Breweries, Inc.*, No. 18-879 (RC), 2018 WL 5297815, at *7 (D.D.C. Oct. 25, 2018); *Pataky v. Brigantine, Inc.*, 259 F. Supp. 3d 1075, 1080 (S.D. Cal. 2017); *Tally v. Brinker Oklahoma, Inc.*, No. CIV-16-451-W, 2016 WL 4523919, at *2-3 (W.D. Okla. Aug. 22, 2016); *Rembert v. J.C.*

*Penny Corp.*, No. 2:13-CV-1074, 2014 WL 790785, at *2 (S.D. Ohio Feb. 26, 2014); *Otis v. Arise Virtual Solutions, Inc.*, No. 12-62143-CIV, 2013 WL 12106056, at *3 (S.D. Fla. Aug. 5, 2013); *Abbott v. Lexford Apartment Services, Inc.*, No. 01-1243-C-B/S, 2002 WL 18000230, at *3 (S.D. In. Aug. 2, 2002). The Tenth Circuit has specifically determined that a party's "lack of memory about the form is entitled [to] little weight in determining whether they actually signed it." *Cross v. United States*, No. 96-3243, 1998 U.S. App. LEXIS 10160, at *21 (10th Cir. May 19, 1998).

Further, Singh's arguments bear striking similarities to the arguments the United States District Court for the District of Colorado rejected in *Ernest*, where an employer moved the court to compel the employee to arbitrate his claims based on the parties' arbitration agreement. 2008 WL 2958964, at *2. Not only did the court in *Ernest* determine that the lack of recollection in signing the arbitration agreement did not create a genuine dispute of material fact, it questioned the consistency and plausibility of such argument as the employee did not dispute his assent to other agreements made on the same day, just as Singh did here. *Id.* at *6. The only onboarding document Singh disputes is the Arbitration Agreement. Yet, according to the audit trails, Singh signed the Confidentiality Agreement on May 18, 2017 at 9:11 am, two minutes after the audit trail shows that he signed the Arbitration Agreement. Within the Confidentiality Agreement, Singh affirmed "I understand and agree that I am bound by the terms of my Arbitration Agreement with DISH."

The court concludes that DISH has met its initial burden of "presenting evidence sufficient to demonstrate the existence of an enforceable agreement." *BOSC, Inc.*, 853 F.3d at 1177. DISH presented a signed copy of the Arbitration Agreement and the audit trails, which confirms the date and time of Singh's assent to the Arbitration Agreement and his assent to the

other five onboarding documents. Conversely, Singh has failed to meet his burden of proof and has not "raise[d] a genuine dispute of material fact regarding the existence of an agreement [to arbitrate]." *Id.* Singh's lack of recollection is insufficient to create a genuine dispute, and he reaffirmed his assent to the Arbitration Agreement in signing the Confidentiality Agreement.

**B. Singh's Request for Limited Discovery**

Relying on the procedural posture of *Ernest*, in which the court granted limited discovery, Singh argues that the Motion to Dismiss and Compel Arbitration is premature and requests the opportunity to conduct limited discovery. The court rejects this request for three reasons.

First, Singh did not cite to any binding authority in support of his claim that limited discovery may be allowable or necessary when the formation of an agreement is in question. Additionally, the Tenth Circuit has clarified that district courts have authority to "decide the arbitration question as a matter of law" only when "a quick look at the case reveals that no material disputes of fact exist." *Id*. Second, in response to Singh's request for limited discovery to review all the audit trails associated with Singh's onboarding documents, DISH provided such documents in its reply memorandum, thereby satisfying Singh's request. Third, the basis for limited discovery in *Ernest* is distinguishable from the case at hand. The facts that have been presented to the court in this case are more developed than those in *Ernest.* The supplied audit trails demonstrate that Singh signed all of the documents on the same day within a four-minute window. The court is persuaded that even if it granted Singh's request for limited discovery, that discovery would not produce any further material evidence as to the parties' agreement to arbitrate. The court therefore denies Singh's request for limited discovery.

**C. Federal Arbitration Act Exemption**

To try and avoid having to submit his claims to arbitration, Singh contends that he is exempt from the FAA. Pursuant to § 1 of the FAA, "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce" are exempt from the FAA. 9 U.S.C. § 1. The Supreme Court, however, has limited "the exclusion provision . . . to transportation workers, defined, for instance, as those workers actually engaged in the movement of goods in interstate commerce." *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 112 (2001) (internal citations omitted). Additionally, the Tenth Circuit has explained § 1 as "extend[ing] only to those individuals employed directly in the channels of commerce itself, similar to seamen and railroad workers; such a narrow construction . . . furthers the modern federal policy favoring arbitration." *McWilliams v. Logicon, Inc.*, 143 F.3d 573, 576 (10th Cir. 1998).

Here, the dispute comes down to whether Singh, as DISH's employee, qualified as a "transportation worker" within the definition adopted by the Supreme Court. DISH maintains that Singh was not involved in the movement of goods in interstate commerce. *See Circuit City Stores, Inc.*, 532 U.S. at 112. DISH describes itself as a provider of satellite television programing and streaming technology services and therefore argues that Singh, as its employee, did not work in the transportation industry. Additionally, DISH argues that Singh was not directly responsible for transporting goods in interstate commerce, as Singh merely coordinated the development of products with customers.

On the other hand, pointing to DISH's national scale and his duties as a Staff Engineering Program Manager, Singh argues that when employed by DISH, he was a worker engaged in foreign and interstate commerce. Singh designed and developed methods and procedures for the

release of software and deployed products to DISH's national and international customers through the internet. Relying on *Bragg v. Linden Research, Inc.*, Singh claims that because transactions that move through the internet are "clearly connected to interstate commerce," he was responsible for the movement of goods in interstate commerce. 487 F. Supp. 2d 593, 604 (3d. Cir. 2007).

The court, nevertheless, is unpersuaded by Singh's arguments and will refrain from adopting his suggested interpretation of § 1 of the FAA. First, *Bragg* is distinguishable from the case at hand, and the assertion Singh makes seems to be taken out of context. *Bragg* concerned a purchase of "virtual land through the internet… [that was] a result of representations made on national media," and the Third Circuit held that while the arbitration agreement at issue there was "clearly connected to interstate commerce," it was still subject to the FAA. *Id.*

Second, Singh's request that the court interpret § 1 in light of a developing economy and technological advances is a departure from the court's fundamental precedent. Courts, for the purpose of interpreting § 1, have drawn a distinction between workers who are "actually engaged in the channels of interstate and foreign commerce" and those workers who are only "engaged in activities *affecting* such commerce, such as the production of goods destined for sale." *Tenney Eng'g v. United Elec., Radio & Mech. Workers*, 207 F.2d 450, 452 (3d Cir. 1953) (emphasis added). Generally, courts have been reluctant to extend the § 1 exemption to the second category of workers because "while their activities will undoubtedly affect interstate commerce, they are not acting directly in the channels of commerce itself." *Id.* at 453 (finding manufacturing employees do not fall into the category of exempted workers under the FAA); *see Lenz v. Yellow Transp., Inc.*, 431 F.3d 348, 352-53 (8th Cir. 2005) (holding that an employee who worked in the transportation industry was not exempt from the FAA because he never directly transported

8

goods or drove a vehicle for the employer and did not have any direct responsibility for transporting the goods in interstate commerce); *Perez v. Globe Airport Sec. Servs., Inc.*, 253 F.3d 1280, 1284 (11th Cir. 1987) (holding that a pre-departure security agent who inspected goods and people at an airport was not "engaged in commerce" and therefore not exempt from the FAA); *Lorntzen v. Swift Transp., Inc.*, 316 F. Supp. 2d 1093, 1097 (D. Kan. Apr. 2, 2004) ("Plaintiff's duties were more akin to those employees who serve an important support role in a transportation industry, but who are not themselves transportation workers. . . . The court concludes in this case that plaintiff is not an exempt transportation worker for purposes of § 1 of the FAA."). The Tenth Circuit has agreed with this distinction and has determined that even when an employer "undoubtedly affect[s] interstate commerce at some level," it does not necessarily follow that the employees are "said to directly affect the channels of interstate commerce." *McWilliams*, 143 F.3d at 576 (finding that a "work area controller" employed by a company that "designs and conducts computer simulated military exercises for the United States military" was not a transportation worker within § 1 of the FAA).

Third, Singh's argument – that deploying software through the internet qualifies him as a transportation worker – seems to mirror an expanding interpretation and analysis of congressional authority under the Commerce Clause. However, the Supreme Court has instructed courts against interpreting § 1 this broadly:

> The general words "in commerce" and the specific phrase "engaged in commerce" are understood to have a more limited reach. In *Allied-Bruce* itself, the Court said the words "in commerce" are "often-found words of art" that we have not read as expressing congressional intent to regulate to the outer limits of authority under the Commerce Clause.

*Circuit City Stores, Inc.* 532 U.S. at 115-16 (citing *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 273 (1995)). Additionally, such "[a] narrow construction of § 1 exclusion … furthers

the modern federal policy favoring arbitration." *McWilliams*, 143 F.3d at 576; *see Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018) (noting that the FAA establishes "a liberal federal policy favoring arbitration agreements" and requires courts to "rigorously" enforce arbitration agreements).

Lastly, the court is concerned with the potential sweeping effects that Singh's interpretation could have if the court chose to adopt it. If the court deems Singh a transportation worker within the meaning of § 1 due to his role in DISH's software development, virtually every employer would have employees that qualified for the exemption, and thousands of employment arbitration agreements would become unenforceable. "In theory all employees could trace a relationship to a transportation worker; therefore, a line must be drawn between employees that are exempt under § 1 and those that are not." *Lorntzen*, 316 F. Supp. 2d at 1097. Because Singh's job responsibilities fall far from those of seamen and railroad workers, the court concludes that Singh was not actually engaged in the channels of interstate commerce and does not qualify as a transportation worker under § 1 of the FAA. In light of the federal policy in favor of arbitration agreements, the court therefore concludes that the Arbitration Agreement is not exempt from the FAA.

## CONCLUSION

Based on the foregoing reasoning, Defendants' Motion to Dismiss and Compel Arbitration is GRANTED, and Plaintiff's Complaint is dismissed with prejudice.

DATED this 11th day of July, 2019.

BY THE COURT:

_____
DALE A. KIMBALL,
United States District Judge